# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

In the Matter of the Search of

Timothy Jay NORMAN,
DOB 07/18/1973

Case No. 1: 21MJ 237

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
The premises known and described as Timothy Jay NORMAN, DOB 07/18/1973 as further described in Attachment A-4

located in the   Middle   District of   North Carolina   , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B - 3

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(d) and 922(g)(1) | Unlawful transfer of firearm or ammunition to a prohibited person; felon in possession of a firearm |

The application is based on these facts:

See the attached affidavit of FBI Special Agent Phillip W. Spainhour

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/S/ Phillip W. Spainhour

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit.

*Applicant's signature*

Phillip W. Spainhour, Special Agent, FBI

*Printed name and title*

Date:  07/01/21

*Judge's signature*

City and state:   Greensboro, NC

L. Patrick Auld, United States Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS FOR
## 126 PIN OAK DRIVE, REIDSVILLE, NC 27320 (TARGET RESIDENCE #1);
## 7372 NC-87, REIDSVILLE, NC 27320 (TARGET RESIDENCE #2);
## 7718 OAK VALLEY COURT, BROWNS SUMMIT, NC 27214 (TARGET
## RESIDENCE #3); AND THE PERSON OF TIMOTHY JAY NORMAN, DATE OF
## BIRTH 07/18/1973

I, Phillip W. Spainhour, Special Agent of the Federal Bureau of Investigation (FBI), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.  I am a Special Agent of the Federal Bureau of Investigation (FBI). I am an "investigative or law enforcement officer of the United States," within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 922(a)(6), Title 18, United States Code – False Statements during Firearm Purchase; Section 922(g)(1), Title 18, United States Code – Felon in Possession of Firearm; and Section 922(d), Title 18, United States Code – Unauthorized Transfer of Firearm to Prohibited Persons.

2.  I have been a Special Agent (SA) of the FBI for more than thirteen years. I am currently assigned to the Charlotte Division at the Greensboro Resident Agency, and focus on investigations involving Public Corruption, Civil Rights and White Collar Crime. Prior to the FBI, I served over ten years as a Detective and Deputy Sheriff with the Forsyth County Sheriff's Office, in Winston-Salem, North Carolina. I have completed hundreds of hours of training in numerous areas of law enforcement investigations and techniques, including but not limited to the following: Basic Law Enforcement Training through the State of North Carolina; Specialized training through the North Carolina Justice Academy; FBI New Agents Training in Quantico, Virginia; and Specialized Federal Law Enforcement training involving White Collar Crime, Public Corruption, Civil Rights, Health Care Fraud, Evidence Response Team (ERT), Organized Crime Drug Enforcement Task Force (OCDETF), Money Laundering, Asset Forfeiture, Counterintelligence, and Domestic and International Terrorism. I have participated in and conducted investigations of

illegal activity involving violent crime, drug and firearms trafficking, gang activity, fraud, money laundering, public corruption, civil rights, white collar crime, domestic and international terrorism, and other violations against the United States. Those investigations have led to the indictments, arrests, and convictions of numerous individuals for various State and Federal criminal violations.

3.     As result of my personal participation in the investigation of matters referred to in this Affidavit and based upon reports made to me by other law enforcement officials, I am familiar with the facts and circumstances of this investigation. The information contained in this Affidavit is provided for the limited purpose of establishing probable cause in support of a search warrant for the Places to be Searched listed in Attachments A-1, A-2, A-3, and A-4, all within the Middle District of North Carolina; therefore, I have not included each and every fact known to me concerning this investigation.

4.     Based on my training, experience, as a law enforcement officer, an FBI Special Agent and particularly from participation in participation in the execution of numerous search warrants authorizing the seizure of firearms, I know:

   a.  Those who own and possess firearms and ammunition generally maintain possession of them for long periods of time.

   b.  Persons who own firearms generally keep them on their persons, in their residences, in outbuildings on their property, in motor vehicles, or in other places where they commonly store their personal property.

   c.  Owners of firearms generally maintain and preserve them over long periods of time for various reasons including, but not limited to the fact that firearms are somewhat expensive, there is an administrative delay in buying them (particularly true for convicted felons who must obtain firearms by subterfuge), and firearms do not easily wear out.

   d.  Persons providing/selling firearms and ammunition to prohibited person including but not limited to convicted felons, often do so only with individuals they know personally or have known personally over a period of time.

2

e. These relationships sometimes serve as a way to connect firearms traffickers with additional customers who are also prohibited persons for the purpose of selling firearms and ammunition. These types of relationships are close knit and based on trust that is developed over time through common ideologies and shared experiences.

f. Firearms are not depleted through use, nor are they typically exchanged immediately after being obtained. Additionally, well maintained firearms are not likely to depreciate in value. Firearms are like expensive tools, which their owners keep and maintain over long periods of time.

g. Firearms and ammunition are generally stored in or about the owner's residence, business, or vehicles because these are places that provide for easy access. These locations also provide an environment where they will be secure from theft, as well as safe from rust and corrosion.

h. Individuals typically keep at their residence records of income (both reported and unreported) and expenditures in the form of invoices, receipts, contracts, bank account statements, loan documents, tax returns, information used to prepare tax returns, bank records, insurance documents, titles, registrations documents, travel records, letters and correspondence. Records of this kind tend to be kept for long periods as they are used in financial, tax and legal matters.

i. Owners of firearms tend to store them in locations which provide easy access to perform routine maintenance. In the residence, business, vehicle, and on the person, the firearm is also readily available in the event the need for its use arises.

j. Those involved in illegal firearms trafficking are even more likely to keep firearms and ammunition in their residence, vehicle, and on their person due to the violent nature of the firearms trafficking trade.

k. Illegal firearms traffickers are known to keep firearms in close proximity for protection due to the likelihood of coming into contact with other individuals who are armed. Illegal firearms traffickers are also known to have readily available access to firearms, which they intend to sell or distribute.

l. Having an available inventory of firearms allows illegal traffickers to increase supply, which in return increases their profits. Additionally, illegal firearms traffickers very often place assets, such as vehicles, in names other than their own to avoid detection of these assets by law enforcement.

3

m. Illegal firearms traffickers often maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the importation, transportation, ordering, sale purchase, and distribution of firearms.

n. That the aforementioned books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers are readily available to the illegal firearms traffickers such as in their residences, places of business, and alternate storage locations (such as storage facilities).

o. It is common for large scale illegal firearms traffickers to maintain supplies of packaging materials and other items, in secure locations for ready access, and to conceal them from law enforcement, including in their vehicles, so they can be easily accessed and quickly moved.

p. That persons involved in illegal firearms trafficking conceal in secure locations, with ease of access, large amounts of currency and other proceeds from firearms transactions and other evidence relating to the sale of firearms.

q. Illegal firearms traffickers commonly maintain addresses or telephone numbers, in books, papers, cell phones or tablets, which reflect names, addresses, and/or telephone numbers for associates in the firearms trafficking community and keep these records in their residences, vehicles, storage buildings on their properties, places of business and storage facilities.

r. It is common practice for persons involved in firearms trafficking to use and maintain computers, phones, and other digital devices in furtherance of their schemes. These devices are used to communicate with co-conspirators related to the subject offenses. Moreover, those involved in the subject offenses often employ such devices when using money obtained from firearms trafficking to make purchases and also keep records of their crimes on such devices.

s. These devices often contain evidence of communications between coconspirators, including call logs and communication conducted by text message, email and applications, to include encrypted applications.

t. Illegal firearms traffickers take or cause to be taken photographs of them, their associates, their property and their firearms and often keep these photographs in their residences, storage buildings on their properties, places of business, and alternative storage locations with other firearms-related documents.

4

## FACTS IN SUPPORT OF PROBABLE CAUSE

5.    On April 15, 2021, the FBI Charlotte Division, Greensboro Resident Agency received information from the Raleigh Police Department (RPD) concerning North Carolina Highway Patrol (NCHP), State Trooper Timothy Jay Norman (Norman), who is a subject of the investigation. In January of 2021, RPD Narcotics Detectives learned through a Confidential Human Source (CHS) who was cooperating as part of a drug trafficking investigation, that Norman had sold firearms to Tommy Lee Hudson (Hudson), who is a subject of the investigation. RPD confirmed Norman and Hudson's identities and that Norman was currently employed as a NCHP State Trooper. They also confirmed Hudson was a convicted felon, prohibited from possessing firearms and ammunition.[1]

6.    Hudson offered to introduce the CHS to Norman, who Hudson described as his source of supply for the purchase of firearms and ammunition. Hudson described multiple firearms purchased from Norman and additional firearms Norman had for sale. Hudson positioned himself to work as broker or middleman between the CHS and Norman for the purchase of firearms. The firearms offered for sale included decommissioned NCHP service weapons described as Sig Sauer P226 357 semi-automatic pistols, Arma Lite, AR-15, 5.56mm, semi-automatic rifles and P. Beretta, Model 1201FP-12 gauge shotguns. The Sig Sauer P226 semi-automatic pistols have the NCHP badge engraved on the top, rear portion of the slide and the Arma Lite rifles have the badge engraved on the side of the magazine well.

---

[1] Hudson was convicted on September 27, 2016 in the Superior Court of Rockingham County, North Carolina, of felony assault with a deadly weapon inflicting serious injury and sentenced to a term of imprisonment exceeding one year. He also confirmed to CHS, as set forth in further detail *infra*, knowledge of his felony status.

7. On January 25, 2021, the Bureau of Alcohol Tobacco Firearms and Explosives (BATFE) – Raleigh Resident Agency conducted an e-trace report on Norman, which resulted in returns for multiple firearms purchases. One of the e-trace reports with a purchase date of April 1, 2020, showed Norman had purchased four (4) Sig Sauer P226 357 semi-automatic pistols with serial numbers 47E051584, 47E051582, 47E053793 and 47E051830 from Lawmen's Distribution LLC, 3319 Anvil Place, Raleigh, NC, 27603 (Lawmen's).

8. RPD provided the FBI with copies of text message communications between the CHS and Hudson, who was at that time described in the CHS's phone as "Tommy Gun."

9. In a January 27, 2021 text message from Hudson to the CHS, Hudson described firearms he wanted to sell for Norman as: "government edition 357 pistols they have a badge or emblem where the sights are."

10. In a February 1, 2021 text message conversation between Hudson and the CHS about the price of the 357 Hudson replied: "Last I heard 1200 new they high af but shooting that compared to a Glock you'll see why it's that price & trust me I'm a Glock man all day but that sig changed me overnight New they 1800-2000 fr."

11. On February 24, 2021, the CHS sent RPD Narcotics Detectives two text message photos they received from Hudson. The photos are described as two semi-automatic rifles and a semi-automatic pistol with magazines, extended magazines, loose ammunition and a set of handcuffs. (See Exhibit A – Text Message Photos #1 & #2).

12. On March 24, 2021, Hudson sent three text message photos from telephone number (336) 520-5946, to the CHS of additional firearms he and/or Norman had for sale. The CHS provided the photos to RPD Narcotics Detectives. The first photo is described as three shotguns and three semi-automatic rifles standing on end, barrels up, leaned against the rear tire

6

of a dark in color truck with black wheels. The three rifles appeared to have the NCHP badge engraved on the right side of the magazine well. (See Exhibit A – Text message Photo #3).

13.     On April 21, 2021, FBI SA Loren Sherman conducted open source database checks for publicly-available social media accounts associated with Norman. SA Sherman located a Facebook account in the name of "Timothy Jay Norman" that contained information and photos that were open to the public for viewing. The photos included one of what appeared to be a 2004 Ford F-150 truck registered to Norman. The style, color and black wheels on the truck appeared to be identical to the one shown in the photo of the three shotguns and three semi-automatic rifles the CHS received as a text message from Hudson on March 24, 2021. (See Exhibit A – FB Screen Shot Photos #1 & #2).

14.     The second and third text message photos the CHS received from Hudson on March 24, 2021, are described as what appears to be a Sig Sauer P226 357 semi-automatic pistol in a case with two magazines and a picture of the same pistol out of its case with a close up of the NCHP badge located on top of the slide near the rear sight. In the close up picture another closed gun case can be seen on the right side of the frame. There is blue tape on the outside of the closed gun case and the name "A.G. Knight" is handwritten in black marker on the tape. A Google search result identified A.G. Knight as a NCHP State Trooper and K-9 handler as of 2020. (See Exhibit A – Text Message Photos #4 & #5).

15.     In a March 25, 2021 text message from Hudson to the CHS from telephone number (336) 520-5946 , Hudson provided his address as 126 Pin Oak Drive, Reidsville, NC, 27320 (Target Residence #1). On that same date the CHS met with Hudson at that location and observed him in possession of numerous firearms. The CHS described the residence as a trailer/mobile home but was not sure if Hudson actually lived at that location. The address was

7

believed to be Hudson's mother's residence. The CHS also observed both Hudson's mother and his girlfriend in possession of firearms at Target Residence #1. Hudson demonstrated several firearms for the CHS by shooting them in the backyard area behind Target Residence #1.

16. Following the firearms demonstration, Hudson and the CHS sat outside the Target Residence #1 in a vehicle. The CHS consensually recorded their conversation with Hudson. During the recorded conversation Hudson described multiple firearms for sale through his source of supply, Norman. Hudson said he had purchased a Beretta shotgun from Norman for $700.00. Hudson described the shotgun in detail and how it functioned as compared to other types of shotguns. Hudson and the CHS discussed the Sig Sauer P226 357 semi-automatic pistol that was offered for sale by Norman. Hudson said only 2000 of those pistols were made, but there were only 1800 State Troopers in North Carolina, so they had extras available. The NCHP had switched from the Sig Sauer P226 to the new Sig Sauer P320 pistol as their issued duty weapon. Hudson implied there was now a surplus of the decommissioned NCHP Sig Sauer P226 pistols available for sale and made accessible to them only because of Hudson's relationship with Norman.

17. Hudson called Norman in the CHS's presence and put the call on speaker so the CHS could hear their conversation regarding firearms that were for sale and prices. During the recorded conversation Hudson asked Norman for a price for another Beretta shotgun, then Hudson told Norman he wanted to purchase four (4) more shotguns. Hudson asked Norman how much it would cost to purchase one of the used NCHP Sig Sauer P226 pistols and Norman stated "14," indicating a cost of $1,400.00. Hudson asked Norman about the cost of the "AR's" and Norman responded: "they cost me like, about 12 … I just want to make something on it, if I buy them and put them in my name." The "12" statement indicated a cost of $1,200.00. Hudson

8

also asked Norman to help him with a recent traffic ticket he received for speeding 68mph in a 50mph zone. Norman responded: "I probably can." The CHS provided the FBI with a copy of the recording.

18.     On April 16, 2021, the CHS advised Hudson said he and Norman were from the same area of North Carolina and had known each other for years. Hudson told the CHS that he and Norman had partied and used drugs like marihuana and cocaine together before Norman became a State Trooper.

19.     On April 21, 2021, the FBI met with the CHS. Hudson told the CHS during several previous occasions when Hudson purchased firearms from Norman, that Norman had been in uniform and driving his NCHP patrol car.

20.     In approximately January of 2021, when the CHS initial met Hudson, he was wearing a tracking monitor on his ankle due to being on probation. The CHS believed it was unlikely Norman would not have known about Hudson's status as a convicted felon since he had to wear the ankle monitor and would likely have been restricted in his ability to travel very far when they met for the purpose of Hudson purchasing firearms from Norman.

21.     On April 21, 2021, the CHS met with Hudson at Target Residence #1. The CHS sent SA Spainhour four text message photos they took at Target Residence #1 of the residence, parked vehicles and Hudson. In one of the photos, a dark colored Volkswagen Passat could be seen bearing NC registration plate HCV-7900.

22.     On April 23, 2021, a check of NC-DMV records for registration plate HCV-7900 resulted in the identification of a 2016 Volkswagen Passat, registered to Deborah Chilton Woods (Woods), White/Female, DOB: 03/11/1963, NCDL# 4264610, at 126 Pin Oak Drive,

9

Reidsville, NC, 27320 (Target Residence #1). Woods had multiple vehicles registered in her name at Target Residence #1.

23.    On April 23, 2021, SA Spainhour showed the CHS a copy of Woods' NC-DMV photo and asked if the CHS recognized the person shown in the photo. The CHS positively identified the photo of Woods as Hudson's mother.

24.    On April 29, 2021, SAs Spainhour and Sherman met with North Carolina State Bureau of Investigation (NC-SBI), Special Investigations Unit (SIU), Assistant Special Agent in Charge (ASAC) William D. Marsh at the FBI Greensboro Resident Agency, because the NC-SBI SIU had agreed to assist the FBI and conduct this joint State and Federal investigation. ASAC Marsh advised the NC-SBI Northern Piedmont District Office (NPDO) (Greensboro) had an open investigation on Norman resulting from a discharging firearms incident investigated by the Rockingham County Sheriff's Office (RCSO) on July 23, 2020 Incident Report #20001291.

25.    The discharging firearms incident occurred at 633 Cedar Lane, Wentworth, NC, during a time when Norman and his wife were separated and living apart. Norman's wife brought the couple's minor children to the residence for a visit with Norman. While at the residence Norman's wife observed a gun laying on the kitchen table. She told Norman the gun should not be out or accessible while their children were present. Norman stated: "It's not loaded, look." Then proceeded to pick up the gun point it at himself and pull the trigger. The gun discharged, striking Norman in the lower portion of his neck, close to his shoulder.

26.    The RCSO and Emergency Medical Services (EMS) responded to the location and provided medical treatment to Norman. Norman's wife told RCSO Deputies that Norman had consumed alcohol and prescribed Oxycodone prior to discharging the firearm. NC-SBI

10

NPDO Case Agent ASAC Kevin Jones provided the FBI with a copy of the RCSO incident report and crime scene photos. The photos showed various types of firearms and ammunition from wall to wall and floor to ceiling. (See Exhibit A – Crime Scene Photos #1 - #7).

27.    Over the course of NC-SBI, ASAC Jones' investigation, he learned that 633 Cedar Lane, Wentworth, NC, where Norman was living at the time of the incident, is a private residence whose owner makes the property available for NCHP State Troopers who are in need of temporarily housing for reasons like spousal separation, etc. Norman's North Carolina driver's license and all of his vehicles are registered at the Target Residence #3 address. All of the controlled firearms evidence purchases occurred with Norman at Target Residence #3. I believe, based on this, that Norman reconciled with his wife and currently lives at Target Residence #3. Therefore, any of Norman's firearms and ammunition that were previously located at 633 Cedar Lane, Wentworth, NC, are likely now located at Target Residence #3.

28.    On May 3, 2021, the CHS met with Hudson and consensually recorded their conversation. During the recorded conversation Hudson said Norman asked Hudson to work for him the previous week clearing twelve acres of land, with the help of three other State Troopers. Hudson told the CHS he didn't want to be around the other Troopers because he did not know them like he knew Norman. Hudson said when he and Norman were around other people, Norman made statements about him like "that dude right there is crazy, he's been to prison, he'll kill a motherfucker." TThis statement by Hudson is further indication Norman and Hudson were both aware of Hudson's criminal history and his status as a convicted felon. The CHS provided the FBI with a copy of the recording.

29.    On May 5, 2021, the CHS advised Hudson told them that Hudson's girlfriend broke his cell phone during the previous weekend (May 1, 2021 – May 2, 2021).

11

30. On May 6, 2021, the CHS purchased Hudson a new prepaid cell phone at Walmart and provided it to Hudson on or about the same day.

31. On May 10, 2021, Hudson advised the CHS he had activated the cell phone and provided the new number as (336) 613-7258.

32. On May 11, 2021, NC-SBI, SIU, ASAC Marsh obtained a North Carolina State Court Order authorizing the installation and monitoring of a Pen Register/Trap and Trace (PRTT) for cellular telephone number (336) 613-7258, used by Hudson. The order was signed by Superior Court Judge S.L. Allen.

33. On May 12, 2021, the CHS provided the FBI with a copy of a recorded conversation between the CHS and Hudson that had occurred on or about May 11, 2021, at approximately 4:56pm (EST). During the recorded conversation Hudson discussed drug use including that of methamphetamine, which he referred to as "Ice" and a prescription pain killer known as Gabapentin. Hudson told the CHS that Hudson's girlfriend had been abusing both methamphetamines and Gabapentin. Hudson said he had open conversations with his fifteen year old son pertaining to mixing Gabapentin and methamphetamine together for the intent of selling it.

34. The conversation then changed to discussing prices of various firearms. Hudson told the CHS he could sell a shotgun to the CHS for $800.00 and that Hudson owned the same shotgun himself. Hudson told the CHS he had bought many firearms from Norman and had done so while Norman was on duty in his patrol car. Hudson talked about meeting Norman in the past while he was in uniform and buying the guns from him in a parking lot of a retail store. Hudson explained when he bought firearms from Norman, the firearms were stored in the trunk of Norman's NCHP patrol vehicle.

12

35.     Hudson told the CHS he and Norman had known each other for a long time and abused cocaine with each other approximately ten (10) years ago. Hudson explained Norman knows Hudson is a convicted felon. Hudson stated: "I don't know no other cop ... fucking police ... that will sell a felon a gun."

36.     Near the end of the conversation, Hudson stated: "My buddy the State Trooper needs some god damn pain pills right now, he's in pain and they won't give him nothing but god damn Tramadol. He said, I used to do Oxycodones: I said for real? We could have had some fun if I'd have known this. I said you need some Oxy's? I'll get you some Oxy's. He said, I'll let you know. I'll be looking for some, I already told him."

37.     On May 12, 2021, the FBI conducted a successful controlled firearms evidence purchase from Hudson and Norman utilizing the CHS. The purchase was consensually audio/video recorded by the CHS and physically surveilled by FBI and NC-SBI ground Agents and an FBI Aircraft. The FBI Aircraft video recorded the air surveillance activities.

38.     The CHS met with Hudson at his girlfriend's residence, 7372 NC-87, Reidsville, NC 27320 (Target Residence #2). While inside Target Residence #2 Hudson took the CHS to a bedroom and showed the CHS numerous firearms, magazines and ammunition. Hudson said he could only buy ammunition that was 115 grains in the store but was able to get access to law enforcement rounds from Norman that were 147 grains, making the bullets much heavier and more powerful. Hudson purchased several boxes of ammunition from Norman for $60.00 per box. Hudson said approximately two months earlier, Norman had offered to sell Hudson one of the used NCHP Sig Sauer P226 pistols for $800.00, because at that time Norman had ten (10) of them in his trunk. Hudson said Norman had "bought in bulk."

13

39.     While still in the bedroom of Target Residence #2, the CHS observed Hudson snort a line what was believed to be methamphetamine. The CHS observed Hudson carrying a Glock 9mm semi-automatic pistol in the front pocket of his hooded sweatshirt. (See Exhibit A – Video Screen Shot #1).

40.     Hudson later called Norman and put the call on speaker so the CHS could hear their conversation. Hudson and Norman discussed the purchase of a NCHP Sig Sauer P226 semi-automatic pistol for $1,600.00. Hudson and Norman discussed additional firearms and ammunition Norman was willing to sell to Hudson and the CHS. Norman offered to sell them 357 ammunition for $70.00 (per box) and 9mm ammunition for $50.00 (per box). Hudson replied, "hollow point?" and Norman said, "Ranger, that's the good shit." Norman said he sold some ammunition the other day to someone for $80.00 a box. Hudson asked Norman if he still had the "AK" because Hudson wanted to purchase a rifle. Norman said he still had the "AK" and confirmed it was the same one Hudson had previously shot. Norman indicated he was willing to meet Hudson and the CHS in person during this purchase and/or future firearms purchases. Norman sent Hudson photos via text message of additional firearms he had for sale. Hudson forwarded the photos to the CHS, who then provided them to the FBI. (See Exhibit A – Text Message Photos #6, #7 & #8).

41.     The CHS provided Hudson with $1,600.00 in US currency (FBI case funds). Hudson and his girlfriend traveled to Norman's residence, 7718 Oak Valley Court, Browns Summit, NC 27214 (Target Residence #3). They drove Hudson's white 2005 Chevy Cobalt, bearing NC registration plate DHK-6770, which is registered to Woods. Hudson met with Norman and purchased a Sig Sauer P226 357 semi-automatic pistol, bearing serial number

14

47A061969, with the NCHP badge engraved on top of the slide, in a case with two magazines for $1,600.00.

42.     Hudson and his girlfriend traveled from Norman's residence to Wendy's at 533 Freeway Dr., Reidsville, NC and delivered the pistol to the CHS. Hudson described his interaction with Norman to the CHS. Hudson said Norman tried to increase the price of the pistol from $1,600.00 to $2,000.00, but Hudson refused. Hudson opined that Norman was getting other people he sold to with that tactic and making a few extra hundred dollars off of those sales. During the operation, NC-SBI, SIU, ASAC Marsh monitored the PRTT for telephone number (336) 613-7258 used by Hudson. ASAC Marsh advised telephone number (336) 613-7258 had communicated by both voice calls and text messaging with telephone number (336) 404-6565 used by Norman. The FBI seized the pistol from the CHS for evidence. (See Exhibit A – Evidence Photos #1, #2 & #3).

43.     On May 19, 2021, BATFE - Greensboro Resident Agency, SA Michael Newsome provided the FBI with current multiple sale query e-trace reports for Norman, covering the dates of October 17, 2019 through April 13, 2021. These reports account for only multiple sales purchased during the aforementioned time period and not for any individual sale purchases which may have also occurred. Based on a review of the reports, Norman purchased twenty-three firearms (23) within a six-month period, eighteen (18) of which were Sig Sauer P226 357 semi-automatic pistols.

44.     One of the e-trace reports with a purchase date of January 14, 2021 showed Norman had purchased five (5) Sig Sauer P226 357 semi-automatic pistols from Lawmen's. One of those Sig Sauer P226 357 semi-automatic pistols contained serial number 47A061969.

15

This serial number matched the NCHP Sig Sauer P226 357 semi-automatic pistol that the CHS purchased from Norman through Hudson on May 12, 2021.

45.    On May 25, 2021, the CHS contacted the FBI and reported a Beretta shotgun and Arma Lite AR-15 semi-automatic rifle were available for purchase from Norman through Hudson. The price of the shotgun was $1,000.00 and the price of the rifle was unknown. Hudson advised he would take the CHS to meet Norman during the next firearms purchase.

46.    On June 3, 2021, the CHS met with FBI Agents and provided a copy of a recorded conversation between the CHS and Hudson. During the recorded conversation, the CHS and Hudson discussed prices for an upcoming controlled firearms purchase. Hudson called Norman to confirm the prices of various firearms. The phone call was placed on speaker phone and the conversation was plainly heard. Norman told Hudson the price of a shotgun was $800.00 and the price for a semi-automatic rifle was $1,600.00. Hudson told Norman he wanted to purchase the firearms in order to give to his dad. In actuality, Hudson was inquiring about the purchase of the firearms for the CHS, but for some unknown reason said he was inquiring for his dad. I believe Hudson's statement may have been an attempt to get Norman to lower the asking prices for the firearms. After the call ended, Hudson warned the CHS that Norman had been raising the prices for the firearms he was selling. The CHS advised they were scheduled to meet with Hudson again on June 4, 2021.

47.    On June 4, 2021, the CHS sent SA Spainhour a text message photo of a white 2013 Chevrolet Traverse bearing NC license plate JER-8466. The accompanying text message from the CHS stated: "Jer8466 his girlfriend car plate." A check of NC-DMV records for license plate JER-8466 resulted in the identification of a 2013 Chevy Traverse registered to Carolyn Ann Sherman (C. Sherman), White/Female, DOB: 02/21/1984, 7372 NC Highway 87,

16

Reidsville, NC 27320 (Target Residence #2). Based on a review of C. Sherman's criminal history report, she is a convicted felon,[2] making her prohibited from possessing firearms and ammunition.

48.     During a recorded conversation on March 25, 2021 between the CHS and Hudson, Hudson said C. Sherman "was in the military for twelve (12) years and that shit fucked her up ... she has PTSD." Hudson and C. Sherman had been together for approximately three years.

49.     On June 4, 2021, the CHS advised they were told by Hudson that C. Sherman had broken his cell phone again and Hudson was temporarily using his father's cell phone.

50.     On June 6, 2021, the CHS provided FBI Agents with Hudson's new cell phone number (336) 552-0526.

51.     On June 7, 2021, the CHS met with Hudson at Kickback Jacks Restaurant, 1600 Battleground Avenue, Greensboro, NC 27408. This meeting was physically surveilled by SAs Spainhour and Sherman. The CHS scheduled a controlled firearms evidence purchase with Hudson and Norman for an NCHP shotgun, AR-15 rifle with magazines and possibly a drum magazine on June 8, 2021.

52.     Following the meeting with Hudson, the CHS met with FBI Agents for debriefing. During the debriefing, Hudson called the CHS. The CHS put the call on speaker for FBI Agents to hear. SA Spainhour used a digital recorder to consensually record the

---

[2] On February 1, 2018, Sherman was convicted in the Superior Court of Rockingham County, in North Carolina, of one count of felony breaking or entering a motor vehicle and two counts of felony financial card theft and sentenced to a term of imprisonment exceeding one year, which was suspended.

17

conversation between the CHS and Hudson. Hudson and the CHS discussed firearms the CHS planned to purchase from Norman and an estimated total cost of approximately $3,000.00.

53. On June 8, 2021, the FBI conducted a successful controlled firearms evidence purchase from Hudson and Norman utilizing the CHS. The purchase was consensually audio/video recorded by the CHS and physically surveilled by FBI and NC-SBI ground Agents and NC-SBI Aircraft. The NC-SBI Aircraft video recorded the air surveillance activities.

54. The CHS traveled to Target Residence #1, where Hudson was living and maintained a bedroom. Once at Target Residence #1, Hudson met the CHS in the driveway and invited them inside. Hudson said he wanted to "show them something." Hudson took the CHS to his bedroom where he showed the CHS a Glock semi-automatic handgun, AR-15 semi-automatic rifle, magazines and ammunition. The CHS described the items as being displayed across Hudson's bed. (See Exhibit A - Video Screen Shot #2).

55. Hudson told the CHS he went through "BLET" (Basic Law Enforcement Training) in 2010 and graduated with Norman. Hudson showed the CHS a photo of their BLET class and pointed out Norman and himself in the photo. Hudson was not immediately able to get hired by a law enforcement agency, so he initially worked for a private security company. Hudson said he "got a felony and couldn't carry a gun no more." Hudson said Norman "begged me to go to Trooper school with him and leave that company." Hudson said he and Norman had worked together for the same private security company. Hudson said he and Norman had done cocaine together in the past. Hudson said, "He knows I'm a felon, I've called him from prison."

56. The CHS and Hudson traveled to Target Residence #3. Hudson told the CHS if Norman knew the CHS was a convicted felon he probably wouldn't sell guns to him, but that Norman would and had previously sold guns to Hudson despite knowing Hudson was a

18

convicted felon. Hudson said Norman kept an unknown amount of U.S. currency in his patrol car that Hudson described as "nothing but hundreds."

57.     After Hudson became a convicted felon, Norman told Hudson his (Norman's) father would hire Hudson to work in construction. Hudson worked for Norman's father a short period of time.

58.     The CHS and Hudson arrived at Norman's residence (Target Residence #3). First, they pulled into the driveway and parked in front of Norman's Ford F-150 truck and trailer. Before meeting Norman, Hudson told the CHS that Norman's full name was "Timothy Jay Norman." Norman arrived soon after them and backed up the driveway, parking his NCHP patrol vehicle between the F-150 truck and his Dodge Charger Hellcat (See Exhibit A – Aerial Video Screen Shots #1 & #2 and Video Screen Shot #3).

59.     Norman exited the patrol vehicle in uniform and met Hudson and the CHS who were standing in the driveway. Hudson introduced the CHS to Norman. Norman drew his service pistol from his duty belt holster and showed Hudson and the CHS NCHP's current issued Sig Sauer P320 service pistol with engraved badge. (See Exhibit A – Aerial Video Screen Shot #3).

60.     Hudson and the CHS followed Norman inside the garage of Target Residence #3. Hudson and the CHS remained in the garage area while Norman went inside and changed out of his uniform and into shorts and a t-shirt. Norman was storing a 30-30 rifle at Target Residence #3 that belonged to Hudson. Norman loaned Hudson $350 and the 30-30 rifle was being held by Norman as collateral for repayment. Norman retuned to the garage carrying the decommissioned NCHP Beretta 12 gauge shotgun, Arma Lite AR-15 semi-automatic rifle and drum magazine the CHS had agreed to purchase.

19

61. Hudson and the CHS stayed in the garage area the entire time they were at Target Residence #3. Hudson was supposed to be purchasing a 60 round drum magazine and some ammunition from Norman for Hudson's 9mm Glock pistol. Norman showed Hudson and the CHS a brand new, decommissioned NCHP Sig Sauer P226 357 semi-automatic pistol that was for sale and still inside plastic. The CHS observed lots of full boxes of ammunition in the garage area, some of which were stored in a large bag on the floor (See Exhibit A - Video Screen Shot #3).

62. Norman, Hudson and the CHS discussed and handled numerous types of firearms, ammunition and accessories while at Target Residence #3. Norman showed the CHS a small silver device/accessory for the AR-15 rifle, which the CHS understood made the rifle fire more rapidly like a fully automatic version. Norman offered to sell the CHS the device for $250.00, but the CHS declined. Norman had several of these devices for sale.

63. The CHS purchased the Beretta shotgun, Arma Lite AR-15 with one magazine, soft black case and a drum magazine from Norman for $3,200.00 (FBI case funds). Norman said one of the guns he sold to the CHS was not his but was "John's gun." There was some discussion between the CHS and Norman about purchasing at a future date, the new, decommissioned NCHP Sig Sauer P226 357 semi-automatic pistol that had been shown to the CHS. Hudson and the CHS said their goodbyes to Norman and left his residence. (See Attached A - Video Screen Shots #4 & #5).

64. The CHS drove Hudson back to Target Residence #1. During the drive, Hudson told the CHS that Norman had run license plates and gun serial numbers for him in the past. The CHS asked if Hudson could get Norman to run some tags for them and Hudson said he believed Norman would. The CHS told Hudson they were a bit anxious about having purchased

20

guns from a State Trooper, because they are a convicted felon. Hudson acknowledged Norman was taking a huge risk in selling firearms to them and had a lot to lose, but then said Norman hadn't even asked the CHS for their full name, ID or anything during the purchase.

65. After dropping Hudson off at Target Residence #1, the CHS met with FBI Agents. The FBI seized the firearms and accessories purchased from Norman for Evidence. (See Exhibit A – Evidence Photos #4 - #10).

66. On June 20, 2021, the CHS received a text message from Hudson using telephone number (336) 552-0529. The text message included a photo of two firearms displayed on the hood of a red vehicle. One firearm appeared to be a shotgun and the other a rifle with extended magazine. The text message stated: "Holler at me gonna sell my 1201 like my buddy had look at the diff tho mine is worth more" ... "For u only u can get my shotgun for 800 that's 200 less than I want but if u know anybody else I need to sell it bc I gotta handle these petty warrants tomoorow6." (See Exhibit A – Text Message Photo #9)

67. On June 21, 2021, NC-SBI, SIU, ASAC Marsh obtained a North Carolina State Court Orders authorizing the installation and monitoring of PRTT for cellular telephone numbers (336) 552-0526, used by Hudson and (336) 404-6565, used by Norman. The order was signed by Superior Court Judge S.L. Allen.

68. On June 24, 2021, the CHS attempted to contact Hudson by telephone, text message and in person by going to Target Residence #1. However, the CHS was unsuccessful in contacting Hudson because according to Woods, whom the CHS spoke with in person at Target Residence #1, Hudson was asleep and had been so for approximately three days straight. The purpose of the CHS's attempted contact with Hudson was to purchase the shotgun and rifle he had offered to sell the CHS on June 20, 2021. Additionally, the CHS wanted Hudson to

21

schedule the purchase of a new, decommissioned NCHP Sig Sauer P226 semi-automatic pistol with Norman. Norman showed this pistol to the CHS during the controlled firearms evidence purchase that occurred on June 8, 2021.

69. On June 24, 2021, at approximately 2:35pm, the CHS initiated a consensually monitored and recorded call to Norman at telephone number (336) 404-6565. During the call, the CHS told Norman over the last few days he had tried to get in touch with Norman though Hudson, but Hudson had been "out of it partying." Norman replied: "Tommy's like that, you can talk to him, then he will disappear for a little while. I will talk to him every day, then I won't talk to him for a week or two, then I'll be like damn, what the hell did you do?" The CHS stated: "He's just partying on them drugs and shit, I've been trying to tell him to slow down." Norman stated: "Yep, learn the hard ways. He ought to know better."

70. Norman agreed to sell the CHS the new, decommissioned NCHP Sig Sauer P226 semi-automatic pistol for $2,000.00. The CHS agreed to meet Norman in approximately thirty (30) minutes at the former Gunter's Citgo convenience store located at 5900 N. Church Street, Greensboro, NC. The store had been closed due to a fire.

71. On June 24, 2021, the FBI conducted a successful controlled firearms evidence purchase from Norman utilizing the CHS. The purchase was consensually audio/video recorded by the CHS and physically surveilled by FBI, NC-SBI and BATFE ground Agents and NC-SBI Aircraft. The NC-SBI Aircraft video recorded the air surveillance activities.

72. At approximately 3:13pm, Norman arrived at Gunter's Citgo in uniform, driving his marked NCHP Dodge Charger patrol vehicle. Vehicle number D252 was displayed on the driver's side rear window of Norman's patrol vehicle. After parking, Norman opened the trunk of the patrol vehicle. The CHS and Norman met near the trunk area, where Norman handed the

22

CHS a black gun case that contained the new, decommissioned NCHP Sig Sauer P226 357 semi-automatic pistol. The CHS placed $2,000.00 in U.S. currency (FBI case funds) on top of a long gun case that was located inside the trunk of the patrol vehicle. Norman then took possession of the U.S. currency. (See Exhibit A – Video Screen Shot #6, #7, #8, #9 and Aerial Video Screen Shot #4).

73.     During the purchase Norman told the CHS: "It's the same one, it's got three magazines, it's got the badge on it." CHS stated: "I should have had you to get me some of them bullets." Norman stated: "My house ain't but right down the road, if you want some bullets."

74.     The CHS stated: "I didn't want Tommy to be pissed ... but he been going hard." Norman stated: "I've been friends with Tommy for a while, I try to help him out, he goes up and down, I don't know if he gets depressed or what ... I used to work with him back in the day, we would work ten to twelve hour days, he would work."

75.     Norman invited the CHS to follow him to a location at 7619 Strawberry Road, Summerfield, NC, to look at an enclosed trailer Norman had for sale. The CHS followed Norman to that location and Norman showed the CHS the trailer. While discussing the trailer, the conversation turned back to Hudson. The CHS told Norman last week Hudson offered to sell the CHS every gun he had. Norman said Hudson "gets to where he need money sometimes." The CHS said Hudson showed them pictures where Hudson and Norman had attended Basic Law Enforcement Training together. Norman said: "We went to BLET, but he let it go ... I told him don't let it go you might change your mind, he let it go, he let it run out ... He's a good boy man, he's been through a lot. He's been through a lot, as far as his life ... You know he tried to kill his self in jail ... his sister wrecked a car, she was on pills and we charged her, I didn't, a Trooper in Rockingham, they charged her with DWI and she killed her little girl or little boy,

23

well I think it was a nephew, Tommy's little nephew, he was in prison so he couldn't even go to the funeral, so that fucked him up ... Last week he tried to sell me that twelve gauge back, he wanted that thirty aut six, I think he wanted me to give him like 900 bucks or 600 bucks, I'd rather have that thirty aut six, I've already got one of those twelve gauges."

76.     The CHS left Norman and met with FBI Agents. The FBI seized the firearm purchased by the CHS from Norman for evidence. (See Exhibit A – Evidence Photos #11 - #16).

## CONCLUSION

77.     I submit this Affidavit supports probable cause for authorizing the search of Target Residence #1, as described in Attachment A-1, because there is probable cause to believe Tommy Lee Hudson, who is a convicted felon and prohibited from possessing firearms and ammunition, is storing firearms and ammunition at the "Property to be searched" location described in Attachment A-1, that is, 126 Pin Oak Drive, Reidsville NC: to include Hudson's white, 2005 Chevrolet Cobalt, NC license plate DHK-6770, VIN: 1G1AL12F457656518, if it is on the property at the time of the execution of the warrant to search the premises listed in Attachment A-1.

78.     I submit this Affidavit supports probable cause for authorizing the search of Target Residence #2, as described in Attachment A-2, because there is probable cause to believe Carolyn Ann Sherman, who is a convicted felon and prohibited from possessing firearms and ammunition, is storing firearms, ammunition, and illegal narcotics at the "Property to be searched" location described in Attachment A-2, that is, 7372 NC Highway 87, Reidsville, NC.

79.     I submit this Affidavit supports probable cause for authorizing the search of Target Residence #3, as described in Attachment A-3, because there is probable cause to believe

24

Timothy Jay Norman is storing evidence of firearms trafficking at the "Property to be searched" location described in Attachment A-3, that is, 7718 Oak Valley Court, Browns Summit, NC; to include the following vehicles registered to Timothy Jay Norman if they are found on the property at the time of the execution of the warrant to search the premises listed in Attachment A-3: a 2004 Ford F-150 truck, NC license plate PFP-4737, VIN: 1FTPW145X4FA40288 and a 2017 Dodge Charger Hellcat, NC license plate THURRSTY, VIN:2C3CDXL9XHH509786.

80.     I submit this Affidavit supports probable cause for authorizing the search of the person of Timothy Jay Norman, as described in Attachment A-4 for phones, computers, or storage medium, because there is probable cause to believe Timothy Jay Norman is storing evidence of firearms trafficking on such phones, computers, or storage medium.

81.     I submit that if phones, computers or storage medium are found at Target Residence #3 and/or in the vehicles described above that are located at Target Residence #3, this Affidavit supports probable cause for authorizing the search of the devices for records which they may contain as provided in paragraph 80 *supra*.

82.     Based on my knowledge, training, and experience, I know that phone and computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a phone or computer, the data contained in the file

25

does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

83. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space- that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a phone's or computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

84. Wholly apart from user-generated files, phone and computer storage media—in particular, phones' and computers' internal hard drives—contain electronic evidence of how a phone or a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Phone and computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

85. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

86. Based upon my training and experience, I know that phone and computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to cloud-based storage. I also know that during the search of the premises it is not always possible to search phone and computer equipment and storage devices for data for a number of reasons, including the following:

    a. Searching phone and computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of phone and

26

computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of phone or computer, software application, or operating system that is being searched;

b. Searching phone and computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Phone and computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since phone and computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. The volume of data stored on many phone and computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d. Phone and computer users can attempt to conceal data within phone and computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Phone and computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, phone and computer users can conceal data within another seemingly unrelated and

27

innocuous file in a process called "steganography." For example, by using steganography a phone or computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

87. Based on my own experience and my consultation with other agents who have been involved in phone and computer searches, searching computerized information for contraband, evidence, fruits, or instrumentalities of a crime often requires the seizure of all of a phone's or computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords), so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

    a. The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

    b. In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). Further, the analyst needs all the system software (operating systems or interfaces, and

28

hardware drivers) and any applications software that may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

## PROCEDURES FOR UNLOCKING ENCRYPTED DEVICES

88. The search warrant requests authorization to use the biometric unlock features of a device (including phones and computers), based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices (including phones and computers). To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Norman's thumb and/or fingers on the

device(s); and (2) hold the device(s) in front of Norman's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

Therefore, I request that the Court issue search warrants for the same.

Respectfully submitted,

/s/ Phillip W. Spainhour
SPECIAL AGENT PHILLIP W. SPAINHOUR
FEDERAL BUREAU OF INVESTIGATION

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit.

L. Patrick Auld
United States Magistrate Judge
Middle District of North Carolina
07/01/21

## Exhibit A

- Text Message Photo #1



- Text Message Photo #2



Text Message Photo #3



- FB Screen Shots #1 & #2





 

- Crime Scene Photos #1 - #7 – (633 Cedar Lane, Wentworth, NC)



- Video Screen Shot #1 (May 12, 2021 @ Target Residence #2)



- Tommy Lee Hudson NC-DMV Photo



- Text Message Photos #6, #7 & #8

 



- Evidence Photos #1, #2 & #3 (May 12, 2021 - purchased from Target Residence #3)





- Video Screen Shot #2 (June 8, 2021 @ Target Residence #1)

- Aerial Video Screen Shots #1 & #2 (June 8, 2021 @ Target Residence #3)





- Video Screen Shot #3 (June 8, 2021 @ Target Residence #3)



- Aerial Video Screen Shot #3 (June 8, 2021 @ Target Residence #3)



- <u>Video Screen Shot # 3 (June 8, 2021 @ Target Residence #3)</u>



- <u>Video Screen Shot #4 (June 8, 2021 @ Target Residence #3)</u>



- Video Screen Shot #5 (June 8, 2021 @ Target Residence #3)



- Trooper Timothy Norman NC-DMV Photo



- <u>Evidence Photos #4 - #10 (June 8, 2021 purchased from Target Residence #3)</u>







- Text Message Photo #9

**10:05**      .ıl 5G E ⬛

< 69      

+1 (336) 552-0529 >



He's out of florida

Today 5:15 AM



Holler at me gonna sell my 1201 like my buddy had look at the diff tho mine is worth more not even being funny

Today 9:31 AM

Happy Father's Day

Thanks bro HAPPY FATHERS DAY as well

For u only u can get my shotgun for 800 thats 200 less than I want but if u know anybody else I need to sell it bc I gotta handle these petty warrants tomoorow6

    Text Message     ⬆

- Video Screen Shot #6 & #7

 

- Aerial Video Screen Shot #4



- Evidence Photos #11 - #16  (June 24, 2021 purchased from Norman @ Gunter's Citgo)











## ATTACHMENT A-1
### "Property to be searched"
### Target Residence #1

## 126 Pin Oak Drive, Reidsville, North Carolina, 27320

"Target Residence #1" is located at 126 Pin Oak Drive, Reidsville, North Carolina, within the Middle District of North Carolina. This includes any outbuildings and the following vehicle if it is on the premises at the time of execution of the warrant: a white, 2005 Chevrolet Cobalt, NC license plate DHK-6770, VIN: 1G1AL12F457656518.

The following is a photograph of the property to be searched at 126 Pin Oak Drive, Reidsville, North Carolina:



## ATTACHMENT A-2
### "Property to be searched"
### Target Residence #2

## 7372 NC-87, Reidsville, North Carolina, 27320

"Target Residence #2" is located at 7372 NC-87, Reidsville, North Carolina, within the Middle District of North Carolina. This includes any outbuildings and the following vehicle if it is on the premises at the time of execution of the warrant: a 2013 Chevrolet Traverse, NC license plate JER-8466, VIN: 1GNKVLKDXDJ188190.

The following is a photograph of the property to be searched at 7372 NC-87, Reidsville, North Carolina:



## ATTACHMENT A-3
### "Property to be searched"
### Target Residence #3

## 7718 Oak Valley Court, Browns Summit, North Carolina, 27214

"Target Residence #3" is located at 7718 Oak Valley Court, Browns Summit, North Carolina, within the Middle District of North Carolina. This includes any outbuildings and the following vehicle if it is on the premises at the time of execution of the warrant: a gray, 2004 Ford F-150 truck, NC license plate PFP-4737, VIN: 1FTPW145X4FA40288 and a black, 2017 Dodge Charger Hellcat, NC license plate THURRSTY, VIN:2C3CDXL9XHH509786.

The following is a photograph of the property to be searched at 7718 Oak Valley Court, Browns Summit, North Carolina:



## ATTACHMENT A-4

### PERSON TO BE SEARCHED

Timothy Jay NORMAN, including any items that he is possessing and/or controlling at the time of the execution of the warrant. This includes items in NORMAN's pockets or hands (like digital devices or briefcases) or on NORMAN's back (like a backpack) at the time of the execution of the warrant.

NORMAN resides at Target Residence #3 and has a date of birth of 07/18/1973. A photo from NORMAN's NC DMV record is below:



## ATTACHMENT B-1
### "Items to be seized"

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely, violations of Title 18, United States Code, Sections 922(d) (unlawful transfer of firearms or ammunition to a prohibited person) and 922(g)(1) (felon in possession of a firearm), in the form of the following:

1. Documentation of occupancy or ownership of premises, where applicable;
2. Bank records, money orders, wire transfer records or receipts, financial instruments, financial transaction records, cashier's checks, traveler's checks, money drafts and related financial records, money wrappers, currency counting machines/devices;
3. United States or foreign currency, negotiable instruments, stocks, bonds, jewelry, precious metals, any lock type box and safes as to conceal or hide from view;
4. Property deeds, vehicle registrations or titles, and/or other items evidencing the obtainment, concealment, and/or transfer or expenditure of funds or currency;
5. Cameras, photographs, videotapes, surveillance systems, or other images of assets and/or firearms;
6. Cellular telephones, tablets, computers, or other electronic devices or storage medium used for record keeping of or communications about firearms purchases and/or firearms sale ledgers;
7. Packaging material, firearms accessories and paraphernalia;
8. Any other weapons, including but not limited to firearms, firearms accessories and ammunition; and
9. Any documentation or communications showing ownership, purchase, sale or transfer of firearms.
10. For any cellular telephones, tablets, computers, or other electronic devices or storage medium whose seizure is otherwise authorized by this warrant, and any phone, computer, or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):
    a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing

history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence; and

c. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of phone, computer, or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

## ATTACHMENT B-2
### "Items to be seized"

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely, violations of Title 18, United States Code, Section 922(g)(1) (felon in possession of a firearm) and Title 21, United States Code, Section 844 (simple possession of controlled substances), in the form of the following:

1. Documentation of occupancy or ownership of premises, where applicable;

2. Bank records, money orders, wire transfer records or receipts, financial instruments, financial transaction records, cashier's checks, traveler's checks, money drafts and related financial records, money wrappers, currency counting machines/devices;

3. United States or foreign currency, negotiable instruments, stocks, bonds, jewelry, precious metals, any lock type box and safes as to conceal or hide from view;

4. Property deeds, vehicle registrations or titles, and/or other items evidencing the obtainment, concealment, and/or transfer or expenditure of funds or currency;

5. Cameras, photographs, videotapes, surveillance systems, or other images of assets and/or firearms;

6. Cellular telephones, tablets, computers, or other electronic devices or storage medium used for record keeping of or communications about firearms purchases and/or firearms sale ledgers;

7. Packaging material, firearms accessories and paraphernalia;

8. Any other weapons, including but not limited to firearms, firearms accessories and ammunition;

9. Any documentation or communications showing ownership, purchase, sale or transfer of firearms; and

10. Any illegal narcotics, including but not limited to cocaine, marihuana, heroin, methamphetamines and prescription drugs in the possession of individuals to which the drugs were not prescribed or that are not contained in the original bottle with prescription label affixed.

11. For any cellular telephones, tablets, computers, or other electronic devices or storage medium whose seizure is otherwise authorized by this warrant, and any phone, computer,

or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence; and

    c. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of phone, computer, or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

## ATTACHMENT B-3
### "Items to be seized"

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely, violations of Title 18, United States Code, Sections 922(d) (unlawful transfer of firearms or ammunition to a prohibited person) and 922(g)(1) (felon in possession of a firearm), in the form of the following:

1. Documentation of occupancy or ownership of premises, where applicable;

2. Bank records, money orders, wire transfer records or receipts, financial instruments, financial transaction records, cashier's checks, traveler's checks, money drafts and related financial records, money wrappers, currency counting machines/devices;

3. United States or foreign currency, negotiable instruments, stocks, bonds, jewelry, precious metals, any lock type box and safes as to conceal or hide from view;

4. Property deeds, vehicle registrations or titles, and/or other items evidencing the obtainment, concealment, and/or transfer or expenditure of funds or currency;

5. Cameras, photographs, videotapes, surveillance systems, or other images of assets and/or firearms;

6. Cellular telephones, tablets, computers, or other electronic devices or storage medium used for record keeping of or communications about firearms purchases and/or firearms sale ledgers;

7. Packaging material, firearms accessories and paraphernalia;

8. Any other weapons, including but not limited to firearms, firearms accessories and ammunition; and

9. Any documentation or communications showing ownership, purchase, sale or transfer of firearms.

10. For any cellular telephones, tablets, computers, or other electronic devices or storage medium whose seizure is otherwise authorized by this warrant, and any phone, computer, or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing

history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence; and

c. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of phone, computer, or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

During the execution of the search, law enforcement personnel are authorized to (1) press and/or swipe the fingers (including thumbs) of Timothy Jay NORMAN to the fingerprint scanner of any COMPUTER found pursuant to the warrant and/or (2) hold any COMPUTER found pursuant to the warrant in front of the face of that same individual to activate the facial-recognition feature and/or iris-recognition feature of the COMPUTER, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

This warrant does not authorize law enforcement personnel to compel other individuals found at the premises to provide biometric features, as described above, to access or otherwise unlock any COMPUTER. Further, this warrant does not authorize law enforcement personnel to compel that Timothy Jay NORMAN state or otherwise provide the password or any other means that may be used to unlock or access the COMPUTERS, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the COMPUTERS.

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF TIMOTHY JAY NORMAN, DOB 07/18/1973 | Case No. 1:21-MJ-237 |

## MOTION FOR PARTIAL SEALING

NOW COMES the United States of America, by Sandra J. Hairston, United States Attorney for the Middle District of North Carolina, through her assistant, JoAnna G. McFadden, and respectfully moves this Honorable Court to partially seal the search warrant affidavit (as identified in the supplement to this motion) and completely seal the supplement to this motion in this matter. Such sealing is within the inherent power of the court to control papers filed with it. *See, e.g., Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 64 (4th Cir. 1989). In support whereof, the government shows unto the court the following:

(1) The search warrant affidavit describes an investigation involving a Confidential Human Source and identifying details related thereto.

(2) Therefore, disclosure of the contents of the search warrant affidavit and the supplement to this motion may have a significant negative impact on the effectiveness the investigation and/or the safety of potential witnesses.

WHEREFORE, the government respectfully moves that this Honorable Court partially seal the search warrant affidavit and entirely seal the supplement to this motion until further order of the Court.

This the 14th day of January, 2022.

Respectfully submitted,

SANDRA J. HAIRSTON
United States Attorney

JOANNA G. MCFADDEN
Assistant United States Attorney
NYSB #4500948
United States Attorney's Office
Middle District of North Carolina
101 S. Edgeworth Street
Greensboro, NC 27401
336/332-6362

2

# UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

IN THE MATTER OF THE SEARCH
OF TIMOTHY JAY NORMAN,
DOB 07/18/1973

Case No. 1:21-MJ-237

FILED UNDER SEAL

## SUPPLEMENT TO MOTION TO SEAL BY THE UNITED STATES

NOW COMES the United States of America, by Sandra J. Hairston, United States Attorney for the Middle District of North Carolina, through her assistant, JoAnna G. McFadden, and supplements the Motion to Seal filed in this case in accordance with *Baltimore Sun Company v. Goetz*, 886 F.2d 60 (4th Cir. 1989). Since the supplement addresses the specific nature of the material the United States seeks to have sealed and the specific reasons for the desired sealing, it is requested that the Court seal this supplement to the motion.

The search warrant affidavit filed in this case details an investigation into the unlawful transfer of firearms, utilizing a Confidential Human Source (CHS). Photographic exhibits to the affidavit contain images of the CHS. Publication of these photographs could expose the identity of the CHS, potentially leading to witness tampering and/or threatening other ongoing investigations utilizing the same CHS. Accordingly, the United States

respectfully requests that the exhibit to the search warrant affidavit be redacted to conceal the images of the CHS, as reflected in Attachment A to this supplement.

WHEREFORE, for all of the reasons set forth above, the United States respectfully requests that the search warrant affidavit be redacted as reflected in Attachment A to this supplement and that this supplemental motion be sealed in its entirety.

This the 14th day of January, 2022.

Respectfully submitted,

SANDRA J. HAIRSTON
United States Attorney

JOANNA G. MCFADDEN
Assistant United States Attorney
NYSB #4500948
United States Attorney's Office
Middle District of North Carolina
101 S. Edgeworth Street
Greensboro, NC 27401
336/332-6362